Good morning, and may it please the court, I am Mark Reichel. I have been Eric McDavid's attorney since his arrest in January of 2006. In my appellate brief, I raise a variety of issues that begin with the inception of the investigation of Mr. McDavid and others, and I brought those motions before the trial court. And through the trial court proceedings, I also raised numerous issues I believe were evidentiary rulings by the trial court which were in error, which denied Mr. McDavid a fair trial. Additionally, finally, at the stage of instructions for the jury, we entered into an area where the jury became confused and the court gave instructions which I think were clear error. And finally, and probably most importantly, it may have been a clerical error, it may have, no one knows the exact reason, but most importantly, when the jury asked the question in a completely entrapment defense case, they asked whether or not the government agent was in fact an agent, the court gave a written instruction to the jury which said no. And shortly thereafter, the jury convicted Mr. McDavid. Mr. Reichel, from my perspective, and I'm only speaking from my perspective, your most potent potential error is the last one that you mentioned. You may not agree with me on that, but just. So if we go through this, you know, obviously from the standpoint that you have some juror declarations, but my understanding of the law is that those can't be used for the point that you're putting them forward. So let's, if we talk about what the judge's error was, there were a series of questions and there were oral answers, right? Yes. All right. Did the judge, from your perspective, make any mistakes in the oral answers? In regard to whether she was an agent or not, no. But there were other, they had several questions. Okay. So the mistake there was in, and I believe that the jurors, someone said something to the effect of, well, that's just a lot for us to take in, Judge, can you write something down, right? That's correct. They were actually advised at the outset to not write because he was going to give them written responses, and then during it they said something to the effect of, wow, this is a lot, and the judge again said, I'm going to provide you something in writing, so rely on that. Are you familiar with our decision a few years ago in Morris v. Woodford? I apologize. I may be familiar. Well, I'm not sure that it was cited by either party, but I'll mention it now, and maybe opposing counsel is familiar with it. In that case, the jurors received correct oral instructions and incorrect written instructions in a death penalty case. Similarly, there's a typographical error where something, life without parole was stated as life with parole, and we held that it was a reversible error, notwithstanding the AEDPA standard, because the thing that was in writing that the jury had in the jury room was wrong by mistake. So I guess for my personal sorting through this issue, the key question for me is going to be harmless error. There certainly was evidence that would have allowed the jury to reject an entrapment offense, as well as evidence in support of it. And the jury also did receive apparently conflicting but correct oral instructions. And so my question to you is, how do we do a harmless error analysis from what everyone admits was a mistake in the written answer to the jury's question? Your Honor, I believe there's several answers to that. First of all, the question whether or not we can consider the juror declarations under 606 of the Federal Rules of Evidence. Juror declarations can be, I believe, are admissible on the issue of whether external influences or an improper influence was permitted in the jury. Well, an incorrect jury, again, speaking only for myself as I think my way through this, a mistake that the trial court makes in responding to a jury question in writing because of a typographical or other innocent mistake that the court makes is not an external influence. It's part of the trial process. It may be an erroneous part of the trial process. But I'm more interested in whether without that we can tell whether there's a likelihood of an effect on the verdict in the case. Your Honor, I believe quite strongly that there cannot be harmless error on that fact pattern, in this fact pattern presented in this case. There cannot be harmless error. It was completely an entrapment matter. The entire trial was about entrapment. The district judge, in deciding what entrapment instructions to give, quite frankly stated on the record something to the effect of this is a close case. You know, I can reasonably see a jury going either way on this. And I can see how some juror could find this to be entrapment. And I think he makes a comment that he doesn't believe there's entrapment. But he says I can reasonably see. He says there's sufficient evidence to go to a jury on entrapment. But that isn't exactly the same as harmless error. Just because an instruction was given doesn't necessarily mean that the error is harmful, does it? I agree, Your Honor. That's correct. But I think there's another few sentences from the district judge where he actually says I can see how someone could find this. I could see how regardless. We have to analyze it ourselves. So what the district court thought doesn't help me very much. How can we see from the record at the trial itself whether this was likely to have an effect on one or more jurors? Because, Your Honor, the government must prove. I think this is error. It's clear error, especially under the Morris v. Woodford case that the Court has cited. But they have to prove beyond a reasonable doubt there was not a reasonable possibility that the complaint of error might have contributed to the verdict. And in this case, the government even stated it when he was discussing some of the questions. They seemed to be confused about entrapment instructions, Your Honor. They seemed to be confused about it. And then we talked about predisposition and contact and so forth. But nevertheless, to me, when you tell the jury in writing the answer is no, the government agent was not an agent. There's no way the government can prevail and prove that this was harmless error. How long was there between the written and erroneous response and the jury's verdict? Not much. It appears that, Your Honor, I know that the record shows this. It's around 11 o'clock they're told orally that day. And then they're told that they're going to be given something in writing to wait for that. Now, there were several things that were typed up. I don't know the timing on that, and I know they were taking lunches that day as well. We came back at approximately 3 o'clock that day. If they're taking an hour-and-a-half lunch to 1.30 or a one-hour lunch, they come back from 1 to 1.30. I think it's around that time. I believe there's no facts on this, but I believe that's around the time they get the written answers. It's shortly thereafter that the verdict comes in. How long had they been deliberating before that? I believe the entire day before and then that morning. So you're saying it's about a day and a third of deliberation and maybe two hours maximum after they receive the written instructions? Yes, Your Honor. I believe so. Well, there's certainly evidence in the record to the effect that, obviously, your client was already involved in attending events prior to the agent ever coming in contact with them, correct? That's correct, Your Honor. That's how they met. Yes, she met him at events. She was doing a paper, and he was already there. No, she actually started doing a paper, I'd say, five months before she meets him. She does a paper in late spring of 2004, the spring semester of 2004, actually. She meets him in August of 2004 in Des Moines, Iowa, so about four, five months later, and that's when he actually goes out to these events in the summer of 2004. He leaves the Sacramento area and heads east. So she meets him in August of 2004, and she very clearly reports back because this was pulled out of trial several times. She reports back on him to the FBI that he's not a person to worry about, he's not violent, that he's very calm. I don't think she says peace-loving, but she says he's not somebody of criminal behavior, and he doesn't appear to be someone who ---- Well, what about the evidence of predisposition? I mean, reluctance is something that you look at on predisposition, correct? Yes. And what in the record shows that your client was reluctant because there seems to be quite a bit of evidence that indicates that things were his idea and he mentioned certain things and that he was very much a contributing, he went out to the locations, all of those things. Well, there's two things. I do want to answer the court's question directly about the evidence of reluctance, but additionally the district court did instruct the jury that predisposition for their consideration begins at the time of the commencement of the crime, which I assert clearly violates Jacobson from the United States Supreme Court and Holman from this court very clearly. But there's a large volume of information that he was reluctant and was not predisposed to this type of crime, and it came from the mouth of the witnesses for the government. We didn't call any witnesses who are eyewitnesses to the crime. Well, what is the evidence of his reluctance from your perspective? Because there's certainly evidence that he wasn't reluctant, but what's the evidence that he was reluctant? The government witnesses testified that, like I said, beginning in August of 2004, he was not involved in any criminal activity and didn't seem to have any intentions in that regard, nor was his mind state of such. Additionally, the government witnesses, Mr. Jensen and Ms. Weiner, Would they testify to his state of mind? No. They testified just to their opinion whether or not he was someone who would be involved in a crime like this and whether he had criminality and whether he acted like he wanted to be involved in such a crime like this, which eventually he was indicted. And the other witnesses, Ms. Weiner and Mr. Jensen, also questioned by me, described him for the jury as, I believe, late of August of 2005, described him as very nonviolent, very peaceful, very easygoing, and someone who would not be involved in this violent type of behavior. And those are the government witnesses who testified to that. And additionally, I could answer the court's question about his reluctance if I was allowed by the district court to put on evidence of his character, what type of person he was, back before the crime began, which was from June to August of 2005. The district court did not allow any character evidence about Mr. McDavid for the time prior to July, June of 2005, disallowed that. I would probably have a much stronger argument for this court about reluctance had I been able to put on those character witnesses. They took the stand and they were precluded because the district court did not feel that was appropriate, even in an entrapment case, to have character witnesses testify to his reluctance and his behavior prior to the time the crime commenced. And I believe there was all sorts of reluctance, Your Honor. Specifically, the main agent for the government, Ms. Anna, was extremely upset in November of 2005 when he would not come to meet with a meeting she was putting up at the request of the FBI. The FBI agent testified that by November they really needed to get an answer on these individuals, whether they were criminal or not, and they urged her to set up a meeting in California. Mr. McDavid could not attend because of family reasons, she expressed on the record and to the other witnesses and to the tapes that she was very upset with him and he was leaving them alone and he wasn't participating and that he didn't want to meet with them at that planning session in November of 2005. He did make that eventually. The erroneous answer that the judge gave in writing, and accepting that that is erroneous, why isn't it possible that the jury could have been confused about the timing of when Anna became an agent, but it doesn't seem that it's disputed that she was an agent. Because the answer, Your Honor, in English language is no, that she wasn't. It was a two-part question. The question from the jury is, was Anna an agent in August of 2004? Next question, if not, when did she become one? The written answer was no. But the oral answer was yes. Yes, that's correct, Your Honor. And it was, as I say, buried in several other long and lengthy discussions about jury instructions. Now what did Mr. Lapham argue about when she was an agent? He agreed. When the question came out, was she an agent of August of 2004, I believe his exact language was something along the lines, we wish she wasn't, but we have to concede that she was. And that's how quickly we answered that question for the jury on the record before they came out, that she was in August of 2004. And, you know, it can't be otherwise. She was an FBI agent. You know, she was working for the FBI solely there and solely dealing with Mr. McDavid and the others through contact at their urging. So if he was agreeing that she was an agent and that's what the judge said initially, how, you know, I guess how was the error harmful in that it appeared that, you know, how could the jury have thought she wasn't an agent? Because they got the written answer from the judge and they were told in this instance, which may vary from other cases, but in this instance they were told by the district judge, you're going to get this in writing. I think something along the lines of rely on that. And this is a lot of information for you, so just hold off. I have a clarifying question. Mr. Lapham said to the trial judge, yes, she was an agent at that time. That was outside the presence of the jury, was it not? Yes. So they didn't hear a confession by the government to that effect. They only heard what the judge said in that back on the record portion. Yes. And the record is the record. Mr. Lapham is here. I hope I'm not misquoting him. But that was my recollection as I stand here. It's a very significant case for me. So what did he say in oral argument? In oral argument on the issue of whether she was an agent or not, what did he say? In his closing argument? Yes. Yes, that she was. I believe they conceded that she was an agent, but I don't think they spent much time on when she became one. Counsel, did anybody object to the judge's written instruction as to the jury say, Judge, you got it wrong? Your Honor, that wasn't posed. It's very interesting, actually, is that in the court system there, everything is filed electronically, and all of the other responses to the jury questions and issues were filed immediately. It wasn't until the next morning. It was the next morning that that response I received. The next morning, it was filed on the court's calendar. They convicted in the afternoon, and the next morning I scanned the document and saw that that written answer went in there. We never saw the written reply given to the jury. We assumed the court was going to write up exactly what we had all agreed upon, and what went in, clerical error or not. How long was your motion following receipt of that information? Immediately. Immediately. So it was the same day? I think within a couple of days or so, yes. And it was not waived. I mean, it was because it seemed rather significant. And as was set forth in declarations, which, you know, by the jury. I'm having difficulty. Perhaps I'm technologically deprived. But the judge sent a message to the jury on his computer, which was played to the jury on their computer, and you didn't see it? I apologize, Your Honor. No, that's not what happened. They came out and asked the question. He then read answers to them and said, I'm going to type this up and provide it to you shortly. And it was typed up and provided to them. Now, when it was typed up, did you ask to see it before it was sent in? No, Your Honor. We agreed he was just going to type them up and hand them to them. Did either party, either counsel, see what was being submitted to the jury before they read it? No, Your Honor. Why was that? Because we had just done it earlier where he had. We had given an answer. He wrote it down and said, this is what I'm going to read to the jury. We all we had extensive discussions. None of you said, may I see that, Your Honor? With what he had in his hand, I was fine with that going to the jury. He gave it to his secretary to type up in writing and then provide to the jury. So it appears to have been a typo of some sort. Well, that seems to be. Best we can tell. Best we can tell, it seems to be that's what happened. But it wasn't that they had two boxes, yes and no. The court had to actually type in the word no and then not answer the second question, which was, if not, when did she become one? Now, the court clerk then takes that document and scans it into the court computer and it gets online so public can access it. That was not done until the next morning. So the jury came out and gave me their verdict at 3 in the afternoon. There was a piece of paper that the judge wrote and it was going into the jury room and neither counsel asked to see it before it went in the jury room? No, Your Honor. I believe it was going to be typed up exactly. And he had told us it was going to be typed up exactly as. Does that mean that we look at it as a clear error? No. I'm sorry, Your Honor. No, Your Honor. I didn't have a chance to. Well, a plain error, but it seems like everybody agrees it was an error. So in that sense it was plain because everybody assumed it would be what he said orally and it was the opposite of what he said orally. That's correct. All right.  So the first thing I want to do is maybe I'll ask you to share your screen. So that we'll – why don't we hear from opposing counsel and you can save the small amount of time you have. Thank you, Your Honor. Good morning, Your Honors. My name is Steve Lapham. As you know, I was trial counsel. Okay. So this written instruction was erroneous, right? Yes. Okay. Everybody – and it seems to be a typo. It seems to be a mistake. It seems to me very analogous to what happened in Morris v. Woodford. Same thing. Jury asks a question. Court gives correct oral instruction, incorrect written instruction by mistake. The incorrect one is what they have in writing in the jury room. So what do we do with that? In that case, we reversed. Or it was a habeas case. We sent it back to the State court. But what do we do? And if we don't reverse, what's different here? Your Honor, I'm sorry. I don't have the benefit of having it. Well, the factual on the other was it was in the penalty phase of a death penalty case, but we're reviewing it on AEDPA. And the jury was supposed to be – they were told you have a choice of, you know, death or life without possibility of parole. But then it gets from there. You have a choice of death or life with the possibility of parole. So the gravity of the error was that the jury could think that he would get out, right? No, not exactly. They were given – the jury had a choice between death penalty and life without parole. They were erroneously told that if they were deadlocked on that question, the court would impose sentence and it would impose life with parole. So they had only their two choices, life without parole and death. That was correct. But the default of what the judge would do if they couldn't agree was where the error came in. And so we went through that. And it was different also because it was the double layer of deference due to the state court, which had found the error to be harmless. But we disagreed with that. And I guess leaving aside whether we've ever had a case like this before, why don't the circumstances in which this occurred make it likely that at least one juror was influenced by this error when they received in writing something that was diametrically wrong? Because, Your Honor, I think it was harmless beyond a reasonable doubt, and here's why. It did not matter in the final analysis whether Anna was a government agent or not a government agent in August of 2004. The question, every question has its context. And the context in this case was they had asked another question, trying to get an idea of what time period they focus on. And they asked, what is the meaning of contact? And the judge answered that word. In other words, contact with a government agent. The judge answered that by saying contact is when they first meet to discuss the crime that's being charged. Well, that was clearly not August of 2004. Whether she was a government agent or not a government agent in August 2004, that's not the proper place where the jury should have been focusing their attention. They had a chance encounter. She went to a crime conference. But couldn't they interpret that no as being she was not a government agent in 2005? No. The question was, was she a government agent in August of 2004? No. The question had two parts. Right. Counsel was correct about that. Was she a government agent in August of 2004? If not, when did she become one? And the answer was no. Now, to me, that's kind of confusing. But it seems to me possible that someone could take from that, a reasonable juror could take from that, that she wasn't a government agent whenever the relevant time frame was. Well, the question was, was she a government agent in August of 2004? The oral answer was, yes, she was. And if not, when did she become one was the other part of the question. But it never got answered in writing, and it never got answered orally either, I don't think. And that's correct. The judge refused to answer that question. He said that, I'm not going to tell you whether it's August 2004 or July of 2005. The solution to that question is contained in the instructions. So all we have, we have inconsistent answers on whether she was an agent in August of 2004. Well, I submit to you that it could be viewed by a reasonable juror as even more confusing than that. Let me just ask the question this way, and I know you don't concede this at all, so just bear with me for the sake of the question. If a reasonable juror could understand the written answer to mean that she was not a government agent at whatever the relevant time might be, then is the error, in your view, still harmless beyond a reasonable doubt? And if so, why? I don't see how a juror in this trial. You're quarreling with my question. Come on. No, I'm not. Okay. No, I'm really not. I don't see how a juror in this trial could have thought that she was not a government agent at least in July of 2005, because that's what the government argued. Okay. You're quarreling with my question, though. The juror, if the premise of my question, and I know you don't concede it, but please, the premise of my question is that a reasonable juror could read this single-word answer to the whole double question as informing it that she was not a government agent at the time that was relevant to their decision. If they could read it that way, then how would the error be harmless? Well, the error could be harmless because it just, it had no, well, the jury was evidently confused about where they should focus their attention. That was clear from their question. Do we focus it on August of 2004 or July of 2005? And the government argued that it was obvious that they should focus their attention on July of 2005. We conceded at least at that point forward that she was a government agent. We actually conceded she was a government agent in August of 2004. I don't see how they could have, if I'm remembering exactly what the written note said, and maybe I'm misrecollecting it, it only dealt with the August 2004 time period. And it basically said you're on your own after that point. Am I? I don't think that's what it said, but that's, the whole case was about entrapment pretty much as it evolved, right? Well, I. The issue before the jury was you didn't think you should be, but that's what it turned out to be. Right. I really disagree with that characterization. This is a case where the government did not seek out a prosecution in this case. This investigation got started by pure chance. Ana's mission was not to develop cases for criminal prosecution. It was to report on real-time potentially violent or illegal activities so that they could be counteracted. She, in fact, in the months that she was in service for the government, she never referred anybody for criminal prosecution. When she first met McDavid in August of 2004, Mr. Reichel does mischaracterize the record. She didn't report back that he was nonviolent and peaceful and all these things. She simply considered him a nonentity, nothing there worth watching. That changed. Nothing there worth watching made me not, were the word peaceable, but nothing there worth watching in a criminal sense means not busy committing crime. I didn't actually, that was my mischaracterization. No, but however. Nothing worth reporting. Meaning nothing criminal afoot. Right. Okay. Now, we turn to July of 2005, and that's dramatically changed. And that doesn't come just from Ana. It comes from Jensen as well, who says that this is the guy I've been traveling with, train hopping across the country for many months, and he's now taken the attitude that nonviolent protest no longer works. He's become much more radicalized. And that's exactly what Ana sees in July of 2005. He's talking about killing police officers, blowing things up. I'm still, I guess I want to get your best argument on this point. And my understanding is that the jury questioned issue was the timing of when Ana became, is it Ana or Ana? I've pronounced it both ways. Okay. Well, was, became an agent. After the court provided the correct oral response that Ana was an agent as of August of 2004, the jury followed up with a question about the relevant time period for entrapment. One juror stated that one of the jury's biggest questions is where we start looking at the evidence of entrapment. Another juror asked, in the entrapment portion, do we consider entrapment from June of 2005 or back to August of 2004? And then there was jury instruction number 15 that stated Ana was an undercover cooperating witness who was involved in the government's investigation. Then you have jury instruction number 18, stated the government has the burden of proving beyond a reasonable doubt that the defendant was not entrapped, and then explained the elements of entrapment. And then I wrote down that in your closing, you stated that Ana was a government agent since the first meeting in August of 2004, but argued that the relevant timeframe for analyzing entrapment was June 2005. And then in the closing, that Mr. Reichel portrayed Ana essentially as a zealous government agent who had already influenced and essentially beguiled Mr. McDavid in August. So is that the chronology? So what is your best argument that the error the judge made was harmless? Because the proper time period to focus on was June or July of 2005. Whether or not Ana was a government agent in August of 2004 made no difference at all to that conclusion. And the reason this case, I think, is conceptually so difficult to understand is it's not like typical entrapment cases. The suggestion for the crime did not come from Ana. I mean, they meet in August 2004. It could be a cocktail party, a chance encounter. The subject simply doesn't come up. She doesn't have very much contact with him at that crime think conference at all. Fast forward 10 months later, now she has more contact, and now he's talking. He brings it up himself. He's talking about doing something big. She doesn't raise any subject about doing violent activity. He's closed mouth at that point. A few weeks later, he now discloses what that something big is. He also discloses that he's now gotten hold of a recipe for C4 and knows how to construct that from common household chemicals. It simply would have been wrong for the jury to focus on August 2004 as the relevant time frame for any of the relevant considerations under entrapment, inducement, predisposition, the initial suggestion for committing the crime. They got a confusing instruction, but in the end, they clearly focused on the right time period, and that was when. That's if they took your word for it, but what about Mr. Reichel's word? Good point. Mr. Reichel, I think, simply erroneously argued that the proper time period to consider was August 2004. There's no evidence in the record that anything of any substance happened in August of 2004. It was simply an encounter. The two individuals, defendant and informant, came into contact, but there's no evidence that there was any discussion whatsoever, and she reported that he was basically a nonentity, inconsequential, I think, was her word. I mean, if this case were sent back for retrial, I think the proper instruction would be that the proper time frame to focus on for government contact would be June or July of 2005, and that is essentially why the error, admitted error, is harmless. It's an interesting question, though, about the timing of it also, because it suggests, I guess the question is how long a process is inducement in a proper case in which there's not a predisposition. If someone takes a long time to induce another person, a year or two years or five years, is it still inducement or does it sometime during that period become the predisposition of the otherwise entrapped person? And why wouldn't one look at the entire course of conduct between the parties to determine those questions? Well, I think the first point you have to look at is who makes the initial suggestion. That's a different question than inducement. Maybe, maybe not. It depends on how much pushing is done by the alleged entrapper. Well, this Court has drawn a distinction. There are five factors you look at for inducement. The first one is who made the initial suggestion, and that's clearly nobody, I think nobody says that Anna made the initial suggestion. McGavitt is the one who recruited Anna. McGavitt is the one who recruited Wiener and Jensen, and Anna didn't even know that, didn't even know that recruitment was being made. Inducement can come later on if she's, and this Court has said, inducement are things like psychological coercion, duress, you know. Well, the inducement here that was raised was that he had a crush on her or he was interested in being involved with her, and so that he would be doing this to impress her or to gain favor. That is the only thing that I heard in this trial, and there was no evidence for that other than Mr. Reichel's statements to that effect. There was no question, I think, that there was some unilateral attraction by Mr. McGavitt. But there's a, there's a. Well, that, you know, if someone knows that another person is smitten with them and they use that against the person, do they have to feel it, too, for it to be manipulation? Well, under this circuit's entrapment law, I think so. But that's not, that's very far from what happened here. I mean, there are cases in this circuit where outright sexual favors have been used to induce the crime, and that hasn't been considered entrapment. But in this case, there's a very telling conversation that occurs in November 2005, which is very late in the game. And McGavitt says to Anna, I don't know if we've talked about this yet. And he's talking about the two of them having some kind of relationship. And she says, no, we haven't. That's very telling evidence that there has been nothing between them. All right. Is that okay? And that, how does that conversation come into evidence? Is it by virtue of what she said, or was that on the, was that recorded as part of the how? Because he didn't testify, right? That's correct. That, that is recorded. I believe that's a recorded call. I can, I can check that for you in a moment. And then the other evidence in the case from Weiner and Jensen is very clear that there was no physical relationship. There was no, in fact, Jensen testified that he thought, if anything, McGavitt was trying to force himself on Anna, and he was concerned about that. I mean, I don't know how you can twist and contort that into an entrapment argument. And that brings me back kind of full circle to the whole point of this, that this is not a typical entrapment type situation. We didn't go out searching for somebody to prosecute. We found an individual who seemed to have been radicalized. He now has recruited three people to join him in a conspiracy. Even at that point, the FBI was not sure what was going on, and the agent testified that when the meeting occurred in November, he would have been just as happy if they talked about punk rock music and other things, benign subjects, and they could decide that this was not going anywhere and they could close their file. But that's not what they did, and McGavitt was the clear leader of the pack here. He could talk about the possibility that their bombs would kill people, and he considered that simply collateral damage. And then we move further down the line, and he's the one who's asking for the bomb recipes. He's the one that's actually going out and researching the targets, doing the reconnaissance. In the government's excerpt of record, there's a map that McGavitt drew when they did the recon of the Institute of Forest Genetics. That's his map, complete with surveillance cameras and government housing and so forth. And then he's taking the lead in actually building the bomb after they assemble all the chemicals. There's no evidence of any inducement in any of those stages along the way, no coercion. The most ANA does is provide the government housing. So is your best argument that the error is harmless is that the evidence was overwhelming? No, no. I think those are two different issues, but that certainly – So tell me what your best argument is. The best argument is that the confusion with the instruction in the final analysis, it focused the jury's attention or the focus of the jury's attention should properly have been in July of 2005, not 2004. And so whatever confusion there was about – or August 2004. So whatever confusion was induced regarding that time period is basically irrelevant. Thank you, counsel. You've exceeded your time. Your argument's been quite helpful and you've answered a lot of our questions. Mr. Reinke, you have some rebuttal time remaining. Thank you, Your Honor. On the issue of the inducement, I want this Court to know that it was very clear in the case that, number one, the first time they met, they spent three days together, Mr. McDavid and ANA, and they slept together. They didn't have sexual relations, but the words of Mr. Jensen, the government witness, and ANA acknowledged was they cuddled and they palled around together like a couple the entire time they met. Thereafter, Mr. McDavid was sending her love letters, which she did not produce at trial and had lost, and these were e-mail love letters. And he expressed his desire to have a crush on her and so forth. And, in fact, later when she meets him in June of 2005, says, I think you've changed, he says, and this is testified to by ANA undisputed, he says, well, you, you're the one that's made me change. You're the one that's changed me. From that point forward, by the way, the government agent paid for absolutely everything. This was an individual and the two others the same. They were homeless and penniless and ate garbage out of trash cans. She paid for everything, where they slept, what they ate, what they did. She drove them around. They didn't have a vehicle. She bought, she bought, she took them to a place, provided the money, drove the car for them to buy marijuana. She also purchased the wine for them. I'm sure the FBI helped her because she was not 21 at the time she bought the wine in California. They smoked the marijuana and they wrote things down in Burn Book, the Burn Book, and they talked about this stuff. Under the influence of marijuana, she drove them to get. Now, finally, in November of 2005, the FBI did a behavioral sciences unit, extensive 240-question study on Mr. McDavid and provided ANA the training on how to, and I believe her testimony was along this line, to keep him on the hook, to not, you know, cause him to be a spurned lover and stop dealing with her. And that clearly, clearly qualifies for inducement, clearly factually qualifies for inducement. And there were two other issues that were raised. Okay, I guess, though, okay, but the jury didn't buy that. Okay, the jury heard all of that and they didn't buy that. So how did this written error contribute to that? I don't know if the jury, well. Well, I mean, they heard all of that, right? You argued all of that. And they did hear that, and then they were told in writing that she was not an agent, so inducement, predisposition, everything, when you're told she's not an agent. She was not an agent in August 2004. They were told in writing that she was never an agent. That's the writing. No, no, no. Was ANA a government agent in August 2004? If not, when did she become one? The court orally answered yes, and the written response erroneously said no. Right. But no to the first question. And the other one wasn't answered. Wasn't answered. If that were alone all the evidence that there were, that would be one thing. But as I heard it, it was conceded in oral argument by the government that in July and June of 2005, ANA was a government agent. And you argued that fact also, did you not? I argued that she was an agent. There was also a look. So you have to take it in context. Well, there was very confusing testimony from the FBI agent, the handler, Mr. Torres, who repeatedly would not call her an agent but kept calling her a cooperating witness, a CW. He said it had legal significance. He kept saying cooperating witness over and over. And then when it came to jury instructions, the instruction the jury got was that ANA was a cooperating witness, something along those lines, and didn't actually say the word agent. So that's why when they asked the question, was she an agent, it becomes profoundly important because this is something that was fought about in the trial through the government's main witness, Mr. Torres, the FBI agent, who kept calling her a cooperating witness and reducing her status. And in terms of timing, this written instruction came after counsel had argued their final arguments to the jury. And did counsel have any other opportunity to speak to the jurors after they got these written materials? No. And they convicted shortly thereafter. No, this was long after oral argument. Okay. You also have exceeded your time, and we appreciate the arguments. The case just argued is submitted. Thank you.
judges: Graber, Callahan, Bea